## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                    )
SHEILA LOGUE,                       )
                                    )
                  Plaintiff,        )
                                    )      Civil Action
v.                                  )      No. 21-11672-PBS
THE RAND CORPORATION,               )
                                    )
                  Defendant.        )
_____)
```

### MEMORANDUM AND ORDER

April 4, 2023

Saris, D.J.

### INTRODUCTION

Plaintiff Sheila Logue ("Ms. Logue") was an employee of Defendant The RAND Corporation ("RAND") for seventeen years, when her employment was terminated without explanation at 69 years of age. She brings this action alleging age and disability discrimination under Mass. Gen. Laws. ch. 151B, §§ 4(1B) and 4(17) (Counts I and II) and retaliation in violation of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615(a)(1) ("FMLA") (Count III). RAND has moved for summary judgment on all counts. After hearing, the Court **ALLOWS IN PART** and **DENIES IN PART** RAND's Motion.

## FACTUAL BACKGROUND

The following facts are undisputed for purposes of summary judgment except where stated.

### A.    The Parties

RAND is a non-profit, global research organization that employs approximately 800 researchers who fund their contracts and projects primarily through grants.

Ms. Logue, a resident of Massachusetts, worked for RAND for 17 years on the Grants Team, a team within the Contracts, Grants & Procurement Department. When she was hired, Ms. Logue lived in California; on November 1, 2017, RAND granted her request to work remotely in Massachusetts for personal reasons.

### B.    Ms. Logue's Work Performance

Ms. Logue began her career at RAND as a Contracts Administrator and progressed through the ranks to her final role at RAND, a Contract Administrator III ("CA-III") on the Grants Team. As a CA-III, Ms. Logue was responsible for all processes related to the preparation, negotiation and submission of highly complex grant proposals, building and maintaining strong relationships with the Principal Investigators ("PI"s) whose grants she managed, and providing clear and timely responses to their requests, among others. Dkt. 45 ¶¶ 13, 15-16, at 4-5. She worked with several well-renowned PIs who worked on complex grants.

Ms. Logue received annual raises or merit increases until

2016, but she did not receive any merit raises in 2017, 2018, or 2019. By September 2019, she was the highest-paid CA-III on her team.

In October 2013, RAND placed Ms. Logue on a performance improvement plan ("PIP") because of issues including delays in getting back to people, an inability to complete assignments, challenges prioritizing her workload, a lack of communication with clients, and deficiencies in knowledge of current federal requirements. RAND removed Ms. Logue from the PIP in May 2014 after she made improvements and demonstrated her ability to do her work capably. Following the PIP, in 2014, 2015, and 2016, Ms. Logue received a "3" ("Fully Meets Expectations") on her performance appraisals.

Ms. Logue began to have work performance issues again in 2017. On December 6, 2017, Mr. Robert Hickam, a Contracts Administrator IV who had some oversight over Ms. Logue, received complaints from a colleague regarding Ms. Logue's performance and shared those concerns with human resources ("HR").

On January 4, 2018, Mr. Hickam reported more concerns about Ms. Logue's work performance to Ms. Danielle Abfalter, the HR Services Manager for the Grants Team, Mr. Gary Chee, one of Ms. Logue's then direct supervisors, and Mr. Dennis Flieder, the former Director of Contracts, Grants & Procurement, this time regarding her failure to abide by one of RAND's grant policies. On January

8, 2018, Ms. Logue's supervisors met with Ms. Abfalter to discuss their concerns about Ms. Logue's performance.

On April 5, 2018, RAND placed Ms. Logue on a second PIP due to "lack of timeliness and accuracy, provision of inconsistent information, poor judgment, and delayed or nonexistent communications." Dkt. 45 ¶ 38, at 11. The parties dispute whether, and when, this PIP ended.

In May 2018, Ms. Logue's colleagues emailed Mr. Hickam with concerns about her performance, and Mr. Hickam forwarded their reports to HR. In April 2018, Ms. Logue apologized for a delay in completing a budget, stating she had been "meeting hard deadlines — anticipated and unanticipated" and that she would "work on [the budget] shortly," which did not occur for 12 days. Dkt. 38-3 at 2-4.

RAND's 2017 and 2018 appraisals of Ms. Logue's performance were not completed and were labeled as "in progress." The 2017 and 2018 appraisals indicate that RAND rated her as a "2" ("Meets Some Expectations").

On September 4, 2019, one of RAND's clients contacted RAND's Chief Financial Officer regarding an invoice that Ms. Logue failed to send by the deadline. Ms. Logue admits that she did not send the invoice to the client.

On September 5, 2019, PI Dmitry Khodyakov told Ms. Logue and the Associate Director of Healthcare, Ms. Claudia McGowan, that he

was "very upset" because Ms. Logue did not keep him informed of his research project's status, causing the project to drag on for a long time, which was "extremely frustrating and distracting." Dkt. 45 ¶ 48, at 14–15. It was Ms. Logue's responsibility to keep the team members apprised as to the status of the project.

On September 13, 2019, Ms. Anissa Greenfield, one of Ms. Logue's direct supervisors, emailed Ms. Logue because a subaward lacked a necessary signature for a month. Ms. Logue later admitted it was her fault the two documents were delayed and acknowledged it was "her responsibility to ensure that the amendment was reviewed and signed in a timely fashion and that a month was an extended period." Dkt. 45 ¶¶ 52–53, at 16–17.

### C.    **Ms. Logue's Family and Medical Leave Act ("FMLA") Leave**

On October 2, 2019, Ms. Logue requested a "six week medical leave of absence to manage her high blood pressure." Dkt. 45 ¶ 54, at 16. Ms. Logue did not tell anyone other than HR the specific reason for her leave. Ms. Greenfield and Mr. Hickam did not know her specific disability. While on FMLA leave, Ms. Logue's responsibilities were split between Mr. Hickam and Ms. Greenfield.

Ms. Logue returned from leave on a limited basis in the last week of December 2019 and on a full-time basis beginning January 6, 2020. All of the awards Ms. Logue had previously been working on were assigned back to her. She requested a ramp-up period to learn RAND's new systems because RAND had implemented Workday, a

new computer system, while she was on leave. Ms. Greenfield agreed to hold onto some of Ms. Logue's proposals to accommodate her request.

The parties dispute whether RAND gave Ms. Logue adequate training to use Workday. Ms. Logue says she never received any training from RAND. RAND claims she received some training on Workday. RAND had plans to bring Ms. Logue to Pittsburgh for a Workday training session but never did so because she was terminated.

### D. **The New Boss**

Ms. Linda Duffy was hired in December 2019 as the Director of Contracts, Grants, & Procurement. Mr. Kenneth Kadlec, the Senior Manager of Contracts & Grants Services, provided Ms. Duffy with information about the department, including the fact that Ms. Logue was out on medical leave. Mr. Kadlec did not "identify any concerns he had about [Ms. Logue's] performance" to Ms. Duffy. Dkt. 50 at 7. Ms. Logue never met Ms. Duffy in person or by videoconference. Ms. Duffy asked HR about Ms. Logue's return date.

On February 20, 2020, Ms. Duffy reported to HR that Ms. Greenfield and Mr. Hickam told her that they "were 'concerned [Ms. Logue] will try to go back on out on a medical leave[.]'" Dkt. 50 at 8-9. On February 27, 2020, Ms. Duffy was told that Ms. Logue worked remotely to help with her grandchild. On March 4, 2020, Ms.

Duffy also received an email from a PI which stated:

> [Ms. Logue] remotely connect [sic] to todays [sic] meeting, but she was so out-of-it that this was even stranger than usual. Not knowing that she had the budget, that I had sent her the draft for coordination, multiple false statements about the supplement – she seemed to be in no shape to do this relative [sic] simple task of submitting a supplemental proposal. It has nothing to do with other deadlines or overwork, it felt like a very strong indication of other issues. She came late, turned her microphone off and had problems turning it on, could either not see (or could not follow) what was on the screen, she just seemed to be in no position to be working.

Dkt. 38-3 at 98. Furthermore, on March 6, 2020, Ms. Duffy received an email from Mr. Hickam which read:

> I wanted to make you aware that [Ms. Logue] was exhibiting some strange behavior in the [Workday] training I gave her this AM . . . . [Ms. Logue] opened Windows Explorer and went into the files on her hard drive, confused as to why it wasn't there. I had to remind her I just sent it to her in an email moments before and she needed to go to Outlook. [Ms. Logue] seemed to have no awareness of what I had just told her moments before until I reminded her one more time.

Dkt. 46-9 at 2.

Ms. Duffy "wanted to 'downgrade' [Ms. Logue's] rating on her performance appraisal for 2019." Dkt. 50 at 10. In March 2020, PIs, colleagues, and some of Ms. Logue's supervisors exchanged emails detailing their concerns with Ms. Logue's performance. Despite these reported concerns, Ms. Duffy did not personally communicate any performance issues directly with Ms. Logue.

Neither Ms. Greenfield nor Mr. Hickam recommended that Ms. Logue be terminated. Up until Ms. Logue's termination, she was

assigned new awards and proposals.

### E.   **Ms. Logue's Termination**

RAND terminated Ms. Logue on March 17, 2020, when she was 69 years old. RAND did not provide Ms. Logue with a reason for her termination when she was fired. Ms. Duffy (age 60 at this time) was the ultimate decisionmaker with respect to Ms. Logue's termination. Members of the HR department, including Mr. Nicholas Bacon and Ms. Abfalter, were involved in this decision. RAND considered relocating Ms. Logue to an in-person office but chose not to because they did not want Ms. Logue to have to "'uproot her entire life to relocate.'" Dkt. 46-11 at 4.

Following Ms. Logue's termination, her work was distributed to Ms. Jessica Higby (age 37), Ms. Greenfield (age 42), Mr. Hickam (age 44), and Ms. Gina Boyd (age 49). Since her firing, RAND has not hired, sought to hire, or promoted anyone into the CA-III position that Ms. Logue once held.

### DISCUSSION

### A.   **Legal Standard**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir.

2018) (quoting <u>Cherkaoui v. City of Quincy</u>, 877 F.3d 14, 23-24 (1st Cir. 2017)). A material fact is one with the "potential of changing a case's outcome." <u>Doe v. Trs. of Bos. Coll.</u>, 892 F.3d 67, 79 (1st Cir. 2018). "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." <u>Carlson v. Univ. of New Eng.</u>, 899 F.3d 36, 43 (1st Cir. 2018).

**B.   <u>Analysis</u>**

**1. Massachusetts Fair Employment Practices Act Claims**

The Massachusetts antidiscrimination statute ("151B") prohibits employers from discriminating against their employees on the basis of a protected status, including age and disability.[1] Mass. Gen. Laws. ch. 151B, §§ 4(1b) and 4(17)).

To prevail on a discrimination claim under the law, a plaintiff must prove four elements: "membership in a protected class, harm, discriminatory animus, and causation." <u>Dusel v. Factory Mut. Ins. Co.</u>, 52 F.4th 495, 503 (1st Cir. 2022) (citing <u>Sullivan v. Liberty Mut. Ins. Co.</u>, 825 N.E.2d 522, 530 (Mass. 2005)).

If direct evidence of discriminatory animus and causation is unavailable, "Massachusetts courts apply the burden-shifting

---

[1] 151B uses the term "handicap," but federal legislation uses the term "disability." <u>Dahill v. Police Dep't of Bos.</u>, 748 N.E.2d 956, 959 n.7 (Mass. 2001).

framework articulated in McDonnell Douglas Corp. v. Green, 411
U.S. 792, 802-05, by which a plaintiff may establish animus or
causation." Dusel, 52 F.4th at 503 (citing Sullivan, 825 N.E.2d at
530 & n.11); Wheelock Coll. v. Mass. Comm'n Against Discrimination,
355 N.E.2d 309, 314 (Mass. 1976). At the first stage, the plaintiff
bears the burden of showing a prima facie case of discrimination.
Bulwer v. Mt. Auburn Hosp., 46 N.E.3d 24, 32 (Mass. 2016). At the
second stage, "the employer can rebut the presumption created by
the prima facie case by articulating a legitimate,
nondiscriminatory reason for its [employment] decision." Blare v.
Husky Injection Molding Sys. Bos., Inc., 646 N.E.2d 111, 115
(Mass. 1995). Because Massachusetts is a pretext only
jurisdiction, at the third stage, "the burden of production shifts
back to the plaintiff employee, requiring the employee to provide
evidence that 'the employer's articulated justification for the
challenged action is not true but a pretext.'" Bulwer, 46 N.E.3d
at 33 (quoting Blare, 646 N.E.2d at 116).

> a. Disability Discrimination (Count I)

Ms. Logue alleges that RAND terminated her on the basis of a
perceived disability. To establish a prima facie case for
disability discrimination under 151B, she must show that she is
(1) handicapped, (2) capable of performing the essential functions
of her job without accommodation or with reasonable accommodation,
and (3) subject to an adverse action by RAND. See, e.g., Godfrey

v. Globe Newspaper Co., 928 N.E.2d 327, 334 (Mass. 2010). Chapter
151B also protects individuals who are "regarded as" having a
handicap, regardless of whether they have an actual physical or
mental limitation. Dahill, 748 N.E.2d at 962-63. "Regarded as"
disability claims "protect[] those persons who, whether actually
impaired or not, may be the victims of stereotypic assumptions,
myths, and fears regarding such limitations." Id. at 963.

     "The Supreme Judicial Court of Massachusetts ("SJC") has
indicated that federal case law construing the ADA should be
followed in interpreting the Massachusetts disability
law." Johnston v. HD Supply Construction Supply, Ltd.,
560 F. Supp. 3d 373, 382 (D. Mass. 2021) (quoting Sensing v.
Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153-54
(1st Cir. 2009) (cleaned up)); see also Dahill, 748 N.E.2d at 962;
Massasoit Industrial Corp. v. Mass. Comm'n Against Discrimination,
73 N.E.3d 333, 339 n.6 (Mass. App. Ct. 2017) ("Massachusetts looks
to Federal law to interpret the definition of disability under
[Mass. Gen. Laws. ch. 151B], except in those situations in which
the Supreme Judicial Court expressly departs from it.").

     In 2008, through the Americans with Disabilities Act
Amendment Act ("ADAAA"), Congress eliminated the requirement that
a plaintiff bringing a claim of "regarded as" disability
discrimination prove that the "employer regarded plaintiff as
having a disability that substantially limited a major life

activity." <u>Izzo v. Genesco, Inc.</u>, 171 F. Supp. 3d 1, 9 (D. Mass. 2016); <u>see</u> 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.") Even under the more relaxed, post-ADAAA standard, Ms. Logue's claims fail.[2]

Under the post-ADAAA standard, a plaintiff must demonstrate they "had an actual or perceived impairment and [their] employer was either aware of or perceived the impairment at the time of the allegedly discriminatory action." <u>Mancini v. City of Providence ex rel. Lombardi</u>, 909 F.3d 32, 46 (1st Cir. 2018); <u>see</u> <u>Mercado v. Puerto Rico</u>, 814 F.3d 581, 588 (1st Cir. 2016).

Ms. Logue alleges that RAND perceived her as disabled based on her medical leave of absence for high blood pressure and various comments about her cognitive abilities. Specifically, Ms. Logue points to concerns that she would go back on medical leave; and

---

[2] Ms. Logue's claims would also fail the pre-ADAAA standard because she failed to establish that the unidentified perceived disability, or even her high blood pressure, substantially limited one or more major life activities when she was given all of her former job responsibilities upon her return from FMLA leave. <u>See</u> <u>City of New Bedford v. Mass. Comm'n Against Discrimination</u>, 799 N.E.2d 578, 588-89 (Mass. 2003).

that she "lacked awareness" during a Workday training session. Dkt. 46-9 at 2.

While there is evidence that members of the HR department were involved in the decisionmaking, RAND highlights the lack of evidence that the ultimate decisionmaker -- Ms. Duffy -- knew about Ms. Logue's high blood pressure. No reasonable juror could conclude that she was terminated based on the perceived disability of high blood pressure. Similarly, no reasonable juror could conclude that the comments about her lack of abilities in learning new technology support a claim of termination based on a perceived mental impairment (other than perhaps aging, discussed in the next section). Accordingly, the Court allows RAND's motion for summary judgment on the disability discrimination claim.

### b. *Age Discrimination (Count II)*

To establish a prima facie case of age discrimination, the plaintiff must demonstrate that they (1) were over forty years of age, (2) performed their job at an acceptable level, (3) were terminated, and (4) were replaced by a similarly or less qualified younger person. Knight v. Avon Prods., 780 N.E.2d 1255, 1262 (Mass. 2003). The Court finds that Ms. Logue has established her prima facie case and proceeds to address the contested prongs.

With respect to prong two, Ms. Logue has produced evidence (albeit disputed) that she performed her job at a reasonable level. Given the "low standard" to establish a prima facie case, Ms. Logue

has met her burden by showing she was employed for 17 years at RAND, received at least a 2 ("Meets Some Expectations") in her performance reviews, was the highest paid CA-III on the team, and, after her FMLA leave was over, was re-assigned all her responsibilities. Dusel, 52 F.4th at 504, 505 (finding that the employee's evidence that he worked for the company for 35 years, "including many years of positive performance reviews, elevation to HBM President and CEO, and significant bonus compensation . . . more than suffices" to meet the employee's burden); Acevedo-Parrilla v. Novartis Ex-Lax, Inc., 696 F.3d 128, 139 (1st Cir. 2012).

Regarding prong four, whether Ms. Logue was replaced, she has established that her tasks were divided among similarly qualified younger people. Ms. Logue need only show that RAND "'sought some form of replacement performance,' demonstrating a 'continued need for the same services and skills.'" Beaupre v. Seacost Sales, Inc., 507 F. Supp. 3d 353, 359 (D. Mass. 2020) (quoting Hidalgo v. Overseas Condado Ins. Agencies, 120 F.3d 328, 332-33 (1st Cir. 1997)). The replacement must be significantly younger than the plaintiff, although an age disparity of less than five years is likely insufficient to support an age discrimination claim. Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000).

Ms. Logue's job duties were distributed to Ms. Higby, age 37, Ms. Greenfield, age 42, Mr. Hickam, age 44, and Ms. Boyd, age 49.

Ms. Logue was 69 when she was terminated, and the replacement employees are at least around twenty years younger than Ms. Logue. Therefore, Ms. Logue has met this element of her prima facie case by showing the replacement employees were substantially younger.

Having a prima facie case established against it, RAND has the burden of production to demonstrate it has a legitimate, nondiscriminatory reason to terminate Ms. Logue. Tex. Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 254-55 (1981); Ruiz v. Posadas de San Juan Assocs., 124 F.3d 243, 247-48 (1st Cir. 1997). RAND has produced evidence of its nondiscriminatory reason -- namely, Ms. Logue's poor performance -- by showing Ms. Logue was placed on two PIPs, had declining performance evaluations, made mistakes in her work, and was struggling to understand new technology.

Because Massachusetts is a pretext only state, Ms. Logue must point to admissible evidence that "might lead a reasonable juror to disbelieve [RAND's] contention that [its] decision to terminate [her] was based purely on a poor performance record." Acevedo-Parilla, 696 F.3d at 142.

She presents evidence to support the following facts. First, upon her return from medical leave, RAND assigned Ms. Logue all the awards she had been working on and continued to give her new assignments. Second, none of Ms. Logue's direct supervisors (neither Ms. Greenfield nor Mr. Hickam) recommended termination.

Third, RAND terminated her before she could go to Pittsburgh for training on the new technology. Fourth, RAND declined to give her the option to return to in-person work because it did not want to "uproot" her from her home in Massachusetts where she was helping care for her granddaughter. Fifth, she was never given a reason for termination.

While RAND has strong evidence pointing to deficient performance, the issue is disputed. A reasonable juror could find that her termination as the highest paid CA-III was based on a perception that as an older employee she could not learn the new technology and lacked the ability to keep up with performance standards. While a termination for an unwillingness or inability to keep up with new technologies does not alone support an age discrimination claim, Ms. Logue claims she wanted to go to the training and improve but was not given the chance. See Ridge v. Cape Elizabeth Sch. Dep't, 77 F. Supp. 2d 149, 166 (D. Me. 1999).

The Court denies summary judgment on Count II.

### 2.  FMLA Retaliation (Count III)

FMLA is intended to "allow employees to balance their work and family life by taking reasonable unpaid leave for medical reasons" or family caretaking responsibilities. 29 C.F.R. § 825.101. An employer is prohibited from discriminating or retaliating against an employee for exercising any FMLA right, including taking unpaid leave. 29 C.F.R. § 825.220(c); see Henry

v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012). Therefore, an employer may not use an employee's decision to take FMLA leave as a negative factor in deciding to hire, fire, or promote the employee. Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719 (1st Cir. 2014).

To make out a prima facie case of FMLA retaliation, Ms. Logue must show that (1) she availed herself of a protected FMLA right, (2) that she was adversely affected by the employment decision, and (3) there was a causal connection between her protected conduct and the adverse employment action. Id.; see Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 161 (1st Cir. 1998) (citing Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997)).

To establish a causal connection, courts examine the temporal proximity between the dates of leave and termination. Though "[t]emporal proximity of an employee's protected activity to an employer's adverse action can be sufficient circumstantial evidence of causation to survive summary judgment," it must be "very close to establish prima facie causality." Workman v. Outfront Media, LLC, 474 F. Supp. 3d 373, 377 (D. Mass. 2020); Lopera v. Compass Grp. USA, Inc., 578 F. Supp. 3d 130, 137 (D. Mass. 2021).

Because the first two elements of an FMLA retaliation claim are not disputed, the Court addresses the third prong: whether there was a causal connection between protected FMLA leave and the

adverse employment action.

In Henry, the First Circuit applied the "negative factor test" to determine causation. 686 F.3d at 55. Under the negative factor test for causation, "employers cannot use the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c) (emphasis added). Under this regulation, "any meaningful causal connection between the taking of FMLA leave and an adverse employment action constitutes retaliation, even if the taking of leave was not sufficient to cause the adverse action on its own." Chase v. U.S. Postal Serv., 149 F. Supp. 3d 195, 209 (D. Mass. 2016).

Courts have disagreed on whether the "negative factor test" continues to be viable. In Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 350-52 (2013), the Supreme Court held that "plaintiffs bringing claims under the anti-retaliation provision of Title VII . . . must prove that retaliation 'was the but-for cause of the challenged employment action.'" Lestage v. Coloplast Corp., 982 F.3d 37, 46 (1st Cir. 2020). Some circuits, including the First Circuit, have declined to address whether Nassar applies to FMLA retaliation claims. See Chase v. U.S. Postal Serv., 843 F.3d 553, 559 n.2 (1st Cir. 2016); Malin v. Hospira, Inc., 762 F.3d 552, 562 n.3 (7th Cir. 2014) (declining to determine whether but-for causation applies to FMLA retaliation claims in light of Nassar); Stanton v. Jarvis Christian Coll., No. 20-40581,

2022 WL 738617, at *5 (5th Cir. Mar. 11, 2022) (explaining that it has not definitively ruled on the effect of Nassar on FMLA retaliation claims, but cautioning against its application); see also Jones v. Allstate Ins. Co., 707 Fed. Appx. 641, 646 (11th Cir. 2017) (acknowledging that the district court "extensively analyzed the standard of causation for an FMLA retaliation claim," but declining to decide which standard applied because the employee failed to prove an adverse action).

The First Circuit has continued to use the negative factor test in FMLA retaliation cases. See, e.g., Carrero-Ojeda, 755 F.3d at 718-19. However, courts in this circuit have split on the appropriate standard. See Gomes v. Steere House, 504 F. Supp. 3d 15, 20 n.4 (D. R.I. 2020) (applying the "negative factor test"); compare Chase, 149 F. Supp. 3d at 209 (D. Mass. 2016) (Woodlock, J.) (holding the plaintiff "need only show that his protected taking of leave was a negative factor in his termination") with Gourdeau v. City of Newton, 238 F. Supp. 3d 179, 194 (D. Mass. 2017) (Young, J.) (concluding that "the causation standard for retaliation claims under both [Title VII and FMLA] ought be the same [i.e., but-for]."). In addition, at least two circuits apply the "negative factor test" to FMLA claims after Nassar. Woods v. START Treatment & Recovery Ctrs., Inc., 864 F.3d 158, 168-69 (2d Cir. 2017); Egan v. Del. River Port Auth., 851 F.3d 263, 273 (3d Cir. 2017). The only circuit opinion ruling plainly to the

contrary is unpublished. Sharp v. Profitt, 674 Fed. Appx. 440, 451 (6th Cir. 2016).

Under either standard, Ms. Logue has established a prima facie case of FMLA retaliation due, in part, to the temporal proximity between her return to work from FMLA leave on January 6, 2020 and her termination on March 17, 2020, just over two months later. Ms. Logue's supervisor, Ms. Greenfield, and an employee with oversight responsibility for her work, Mr. Hickam, experienced concern that she would go back on medical leave. Taken together, Ms. Logue has presented evidence that her termination was a pretext of retaliation for taking FMLA leave. See Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (noting "there are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation" including "temporal proximity" and "comments by the employer which intimate a retaliatory mindset"); see also Carrero-Ojeda, 755 F.3d at 720. Therefore, the Court denies summary judgment on Count III.

**<u>ORDER</u>**

For the foregoing reasons, RAND's Motion for Summary Judgment (Dkt. 37) is **ALLOWED IN PART** and **DENIED IN PART**. The Court allows summary judgment as to Count I and denies summary judgment as to Counts II and III.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge